FRANK S. FERRALL v. SUSIE PATTERSON FERRALL.

(Filed 12 October, 1910.)

1. **Races—Intermarriage—Third Generation—"Pure Negro Blood."**

To bring an action for divorce, *a vinculo* within the meaning of Revisal, sec. 2083, which, among other things, declares void a marriage "between a white person and a person of negro descent to the third generation inclusive," etc., it must be shown the ancestor of the generation stated must have been of pure negro blood.

2. **Same—Constitutional Law—Evidence.**

The Constitution, Art. XIV, sec. 8, by prohibiting marriages between "a white person and a person of negro descent to the third generation inclusive," adopted the language of statutes of the same or similar terms as the Revisal, sec. 2083, which the decisions of the Court had construed to mean that the ancestor stated must have been of pure negro blood to render the marriage void; and while the adoption of this language is not necessarily conclusive, it is wellnigh convincing evidence that the words contained in the Constitution were intended to bear their established meaning.

3. **Appeal and Error—Verdict Set Aside—Substantial Right—Procedure.**

A party litigant has a substantial right in a verdict obtained in his favor, and where one has been rendered on issues which are determinative and is set aside as a matter of law and such ruling is held erroneous, the appellate court will direct that judgment be entered on the verdict as rendered.

APPEAL from *Cooke, J.,* at the October Term, 1909, of FRANKLIN.

The summons was issued in November, 1907, and complaint filed and duly verified, alleging that plaintiff was a white man; that he had married defendant in January, 1904, and seeking divorce on the ground that defendant "was and is of negro descent within the third generation" and averring plaintiff's ignorance of this fact at the time of the marriage. Defendant answered formally denying the allegation in reference to her being of negro blood within the third generation and averred with reference thereto: "While plaintiff was courting her he was repeatedly informed that there was a strain of Indian or Portu-

FERRALL v. FERRALL.

guese blood in defendant's veins, and he was also informed that some people insisted that there was a strain of negro blood in defendant's veins, and defendant said he proposed to marry her in spite of such rumors. Defendant told plaintiff that she did not want to marry him on account of these rumors, but he insisted on the marriage."

Defendant further answered, by way of cross bill duly verified and alleged, "That the plaintiff, after the birth of their little girl, cruelly treated her; would get drunk and abuse her in the vilest manner, refuse to provide her with the common necessities of life, and abandoned her and his own child, and left her without providing her any support. He left her in a delicate condition and expressed the wish that her condition would kill her. Wherefore she prays for divorce from bed and board from plaintiff and for alimony for herself and child."

The cause was tried at the term of court stated, on issues arising upon plaintiff's complaint, and the jury rendered the following verdict:

1. Were the plaintiff and defendant married as alleged in the complaint. Answer: Yes.

2. Has plaintiff been a resident of the State of North Carolina for two years next before the bringing of this action? Ans.: Yes.

3. Is the defendant of negro descent within the third generation as alleged in the complaint? Answer: No.

4. Did the plaintiff abandon the defendant as alleged in the' cross bill? Answer: Yes.

The evidence tended to fix a strain of negro blood in Julius Coley, a great-grandfather of defendant, and in reference to this claim the court charged the jury: "But it is contended by the defendant that the taint in the blood came from the defendant's great-grandfather, Julius Coley, who the plaintiff contends was a negro, and the court instructs the jury that if they are satisfied by the greater weight of the evidence that the said Julius Coley was a real negro, then they should answer the second issue Yes, but if they should not be so satisfied, then they should answer that issue, No." And as follows:

6. "The court further instructs the jury that by real negro he meant one that did not have any white blood in him."

On coming in of the verdict there was motion by plaintiff to set the same aside for error in law in the portion of the charge contained in the sixth instruction above quoted. The court, being of opinion that said instruction was erroneous, set the verdict aside on that ground, and defendant excepted and appealed.

*F. S. Spruill* for plaintiff.
*Bickett & White* for defendant.

HOKE, J. The statute law applicable to the question presented, being the first part of sec. 2083, Revisal of 1905, is as follows: "Who May Not Marry.—All marriages between a white person and a negro or Indian or between a white person and a person of negro or Indian descent to the third generation inclusive . . . shall be void." This or some enactment expressed in similar terms, has long been the statute law of our State governing questions of this character, and when before the Court the accepted construction with us, so far as examined, has always been that where all other persons whose race or blood affected the question were white, in order to bring a marriage within the prohibited degree, one of the ancestors of the generation stated must have been of pure negro blood. Thus in *Hare's case,* 113 N. C., p. 10, on the right of an applicant to be admitted into the white schools, the statute providing separate schools for the two races, at that time defined the status of a rightful applicant in language exactly similar to this law as to marriage, it was held that the ancestor of the third generation whose blood should determine the issue must have been of pure negro blood. *Associate Justice Avery,* delivering the opinion, after stating that the question was controlled by sec. 1810, the Code of 1883, now the section of the Revisal above quoted, said further: "The words used in sec. 1810 as to the third generation inclusive must therefore be construed to prohibit intermarriage of whites with persons who are not beyond the third generation or in the fourth generation from the pure negro ancestor." Again in *State v. Waters,* 25 N. C., p. 455, where the validity of the marriage in question was affected by statutes

since repealed, which established the fourth generation as the determinative period, the ancestor whose blood must decide the issue was referred to by *Chief Justice Ruffin* as a "full negro." And so in *State v. Chavers,* 50 N. C., p. 11, involving the construction of a statute defining free negroes as "all free persons descended from negro ancestors to the fourth generation inclusive." The Court, *Battle, Judge,* delivering the opinion, approved a charge, "That every person who had one-sixteenth negro blood in his veins was a full negro," within the meaning of the statute, and said further, referring to the expression to the fourth generation inclusive, "That no person can cease to be a full negro unless he has reached the fifth generation from his African ancestor. A similar principle of construction has been established by authoritative decisions in other States where this matter is of vital importance. *McPherson v. Commonwealth,* 69 Va., p. 639; *Linton v. State,* 88 Ala., p. 217. And we find nothing which tends to the contrary except a very recent decision of the Supreme Court of the District of Columbia in *Isabel Wall by her next friend Stephen Wall v. James Oyster, et al.,* a case which has not yet appeared in the official reports, and was kindly procured for us by the diligence of plaintiff's counsel. That case involved the construction of a statute of Congress providing for separate white and colored schools in the district, and arose on application for *mandamus* to the board of education to enroll petitioner in a white school, the admission having been made that the petitioner had not less than one-sixteenth negro blood. The application was denied on the ground chiefly that as Congress had not undertaken by enactment to define "What race or what percentage or proportion of racial blood shall characterize an individual as 'colored,' the term, being without legislative definition, is left to the import ascribed to it in the common parlance of the people," and applying this rule it was held that according to the principle there adopted the applicant must be considered a colored child within the meaning of the statute." If this decision was in direct contravention of the principle obtaining here it would not justify the Court in departing from a line of precedents long recog-

FERRALL v. FERRALL.

nized as authoritative and controlling in this State, but it will be noted that the language of that statute is very general in its terms "white" and "colored" schools, and on that very account the common parlance of the people was allowed to prevail, and the case therefore presents a very different question from the one we consider in construing a statute which defines the status as "a person of negro or Indian blood to the third generation inclusive."

In this connection an interesting compendium of the laws of the Southern States on this subject was furnished us by defendant's counsel, showing that the four States of Alabama, Tennessee, Maryland and North Carolina make substantially the same provision with reference to these marriages, and that all of them have regulations on the subject in terms equally specific and definite. In view, then, of these decisions of our own courts, to which reference has been made, and the very definite language of our statute, we may not approve the position earnestly insisted upon by plaintiff's counsel that the negro ancestor, whose blood must determine the issue, should be considered not a negro of pure African blood, but one who has his status as a negro ascertained and fixed by the recognition and general consensus of the community where his lot is cast. Such a position ignores the ordinary and usual acceptation of the words, "Of negro descent to the third generation inclusive," is contrary, as stated, to a long line of authoritative precedents here, and is further objectionable in setting up a varying and uncertain standard by which to determine a most important legislative requirement in the civic and social polity of the commonwealth. We are confirmed in this view by the fact that this same enactment as to negroes long embodied in our statute law, and with this repeated and well-known construction by the Court, was afterwards transferred without any change whatever into the Constitution of the State and is now a part of our organic law. In Art. XIV, sec. 8, it is ordained "That all marriages between a white person and a negro or between a white person and a person of negro descent to the third generation inclusive are hereby forever prohibited." The action of our Constitutional Convention in thus adopting a public statute of accepted construction and on a subject of

momentous interest and making the same, in its entirety and very words, a part of our organic law, while not necessarily conclusive, affords well-nigh convincing evidence that the words were intended to bear their established meaning, and on this subject should so prevail as the law of the land. *Rhyne v. Lipscombe,* 122 N. C., pp. 650, 654.

It may be well to note that since the decision of *Haire v. Board of Education, supra,* the legislation as to separate schools for the two races has been changed, and it is now provided, "That all white children shall be taught in the public schools provided for the white race and all colored shall be taught in schools provided for the colored race, but no˙ child with negro blood in its veins, however remote˙ the strain, shall attend a school for the white race." Public Laws 1903, ch. 435, sec. 22; Revisal 1905, sec. 4086. The language of our Constitution on this subject, Art. IX, sec. 2, is: "And the children of the white race and the children of the colored race shall be taught in separate public schools, but there shall be no discrimination in favor of or to the prejudice of either race." It will be observed here that unlike the section controlling the question of marriage, the words used are of more general import and permit of legislative definition in fixing the status of the two races as in the case of *Wall v. Oyster et al., supra.* It is well established that a party litigant has a substantial right in a verdict obtained in his favor, and where one has been rendered on issues which are determinative and is set aside as a matter of law, and such ruling is held to be erroneous, the appellate court will direct that judgment be entered on the verdict as rendered. *Shives v. Cotton Mills,* 151 N. C., pp. 290, 294; *Abernethy v. Yount,* 138 N. C., p. 337. Being of opinion that the original charge of his Honor correctly stated the law applicable to the case, we hold there was error in setting aside the verdict and this will be certified that judgment be entered thereon for defendant.

Reversed.

CLARK, C. J. I concur in all respects with the opinion of the Court so clearly stated by *Mr. Justice Hoke.* Not only is the wife protected by the law upon the facts as found by the jury

FERRALL v. FERRALL.

under a correct charge of the judge, but it would be difficult to find a case so void of merit as that which the husband presents.

Years ago the plaintiff married a wife, who, if she had any strain of negro blood whatever, was so white he did not suspect it till recently, so he states. He does not aver even that she deceived him, so she herself must have been unaware of the fact, if it existed. She has borne him children. If he could show fault in her conduct in any way, it is to be presumed that in these days of easy divorce he would have sued on that ground. His divorced wife might in some circumstance have been still entitled to alimony and dower.

The plaintiff by earnest solicitation persuaded the defendant to become his wife in the days of her youth and beauty. She has borne his children. Now that youth has fled and household drudgery and child-bearing have taken the sparkle from her eyes and deprived her form of its symmetry, he seeks to get rid of her, not only without fault alleged against her, but in a method that will not only deprive her of any support while he lives by alimony, or by dower after his death, but which would consign her to the association of the colored race which he so affects to despise. The law may not permit him thus to bastardize his own innocent children—Revisal, 1569; *Setzer v. Setzer,* 97 N. C., 252—but he would brand them for all time, by the judgment of a court, as negroes—a fate which their white skin will make doubly humiliating to them.

If indeed, the plaintiff had discovered any minute strain of colored origin after the youth of his wife has been worn away for his pleasure and in his service, justice and generosity dictated that he keep to himself that of which the public was unaware—or if the knowledge had become public and was disagreeable, the plaintiff, if possessed of any sentiment of manhood, would have shielded his wife and children by removing to another locality or to a State where the fact, if known, would not be deemed a stigma. Certainly of all men he should have welcomed the verdict that decided his wife and children are white.

The eloquent counsel for the plaintiff depicted the infamy of social degradation from the slightest infusion of negro blood.

He quoted from a great writer not of law, but of fiction, the instance of a degenerate son who sold his mulatto mother "down the river" as a slave. But his crime was punished, and surely was not greater than that of this husband and father, who for the sake of a divorce, would make negroes of his wife and children, hitherto white and whom the jury still find to be so. He deems it perdition for himself to associate with those possessing the slightest suspicion of negro blood, but strains every effort to consign the wife of his bosom and the innocent children of his own loins to poverty and to the infamy that he depicts. The jury did not find with him and he has no reason to ask any court to aid him in such a purpose.