### Mullins, By, et al. v. Belcher.

(Decided March 9, 1911.)

### Appeal from Pike Circuit Court.

Schools—Colored Children—Constitutional Provision.—Under section 187 of the Constitution of Kentucky providing for the maintenance of separate schools for white and colored children the words "colored children" include all children wholly or in part of Negro blood, or having any appreciable mixture thereof. Children who are of Negro blood to the extent of one-sixteenth are therefore colored children and not entitled to attend schools maintained for white children.

J. E. CHILDERS and A. F. CHILDERS for appellant.

ROSCOE VANOVER for appellee.

OPINION OF THE COURT BY WM. ROGERS CLAY, COMMISSIONER—Affirming.

Troy Mullins and Loucreta Mullins are infants between the years of six and twenty. They reside in Common School District No. 28 in Pike county, Kentucky. Appellee Edmond Belcher is the trustee of that school district. He notified appellants that they could not attend said school. Appellants, suing their guardian and next friend, Miles Ratliff, brought this action against appellee Edmond Belcher to enjoin him from interfering or in anywise preventing their at-

tending said school. Appellee defended on the ground that the appellants were colored children, and, therefore, not entitled to attend the school in question, which was maintained and conducted exclusively for the education of white children. The affirmative allegations of the answer were denied by reply. Proof was then taken and the case submitted. The trial judge made a separate finding of the law and the facts. He found that appellants had one-sixteenth negro blood, and concluded, as a matter of law, that they were "colored children," and, therefore, not entitled to attend the school in question, and entered judgment accordingly. From that judgment this appeal is prosecuted.

Section 187 of the Kentucky Constitution is as follows:

"In distributing the school fund no distinction shall be made on account of race or color, and separate schools for white and colored children shall be maintained."

The question before us is: Who are "colored children" within the meaning of the above section?

While it may be doubted if appellants' proportion of negro blood is as small as one-sixteenth, it is not contended that it is less. We shall, therefore, consider the case from this standpoint; that is, that their proportion of negro blood is one-sixteenth.

For appellants it is insisted that, in order to constitute a person a "colored person," he must not only have an appreciable admixture of negro blood, but must also show the racial characteristics of the negro. In this connection it is insisted that appellants are as fair as members of the white race, and there is nothing in their personal appearance to indicate the presence of negro blood. In our opinion, however, the question does not depend upon personal appearance. The color of the person may be one means of indicating the class to which he belongs, but the question in its final analysis depends upon whether or not the person has, or has not, an appreciable admixture of negro blood.

In the case of Enos Van Camp v. The Board of Education of the Incorporated Village of Logan (decided in 1859), 9 Ohio St., 406, the Supreme Court of Ohio, in discussing the question arising under a statute of that State providing for separate schools for white and colored children, used the following language:

"Our standard philologist, Webster, defines 'colored people' to be 'black people—Africans or their descend-

ants, mixed or unmixed.' Such is also the common understanding of the term. A person who has any perceptible admixture of African blood is generally called a colored person. In affixing the epithet 'colored,' we do not ordinarily stop to estimate the precise shade, whether light or dark, though where precision is desired, they are sometimes called 'light colored,' or 'dark colored,' as the case may be. If we look at the evils the law was intended to remedy, we shall arrive at the same result. One of the evils undoubtedly was the repugnance felt by many of the white youths and their parents to mingling, socially and on equal terms, with those who had any perceptible admixture of African blood. This feeling or prejudice, if it be one, had been fostered by long years of hostile legislation and social exclusion. The general assembly, legislating for the people as they were, rather than as, perhaps, they ought to have been, while providing for the education and consequent ultimate elevation of a long-degraded class, yielded for the time to a deep-seated prejudice, which could not be eradicated suddenly, if at all. Such an arrangement, in the present state of public feeling, is far better for both parties—for the colored youth as well as those entirely white. If those a shade more white than black were to be forced upon the white youth against their consent, the whole policy of the law would be defeated. The prejudice and antagonism of the whites would be aroused, bickerings and contentions become the order of the day, and the moral and mental improvement of both classes retarded. It would seem, then, from this examination of the law of 1853, and the circumstances under which it was passed, that the words 'white' and 'colored,' as used in that act, were both used in the ordinary and common acceptation, and that any other construction would be violence to the legislative intent, and perpetrate the very evils that act was intended to remedy."

In the recent case of State v. Treadway, et al., 52 Sou. Rep., 500, the Supreme Court of Louisiana, speaking through Mr. Justice Provosty, said:

"There is a word in the English language which does express the meaning of a person of mixed negro and other blood, which has been coined for the very purpose of expressing that meaning, and because the word negro was known not to express it, and the need of a word to express it made itself imperatively felt. That word is the

word 'colored.' The word 'colored' when used to designate the race of a person is unmistakable, at least in the United States. It means a person of negro blood, pure or mixed; and the term applies no matter what may be the proportions of the admixture, so long as the negro blood is traceable.''

And in the still more recent case of Isabel I. Wall, By, et al. v. James F. Oyster, et al., 38 Wash. Law Rep., 794, the Court of Appeals of the District of Columbia held that, under the act of Congress providing for the maintenance of separate free schools for white and colored children in the District of Columbia, a child possessing from one-eighth to one-sixteenth negro blood was a "colored child." After citing the cases above referred to, that court said:

"The most reliable sources of information in this regard are the dictionaries which are universally accepted as the best exponents of the popular meaning of the words of the language. It is sufficient to say, without quoting from them, that these show that the word 'colored' as applied to persons or races is commonly understood to mean persons wholly or in part of negro blood, or having any appreciable admixture thereof. See Webster's International, the Standard, and the Century Dictionary.''

As the makers of the Constitution did not undertake to define the words "colored children" as employed in section 187, we conclude that these words were used in their ordinary and general sense, and that they include all children wholly or in part of negro blood, or having any appreciable admixture thereof. It follows that the injunction prayed for was properly refused.

Judgment affirmed.