J. S. JOHNSON v. BOARD OF EDUCATION OF WILSON
COUNTY.

(Filed 16 September, 1914.)

1. Schools—Colored Race—Negro Blood—Constitutional Law.

Our Constitution, Art. IX, sec. 2, requiring that the General
Assembly provide for a "general and uniform system of public
schools," etc., and that "the children of the white race and the
children of the colored race shall be taught in separate public
schools, but that there shall be no discrimination in favor of or
to the prejudice of either race," gives authority to the Legisla-
ture to declare what shall be considered a "white child" or a
"colored child"; and Revisal, sec. 4086, prohibiting a child "with
negro blood in his veins, however remote the strain," from at-
tending a school for the white race, is constitutional and valid.
Art. XIV, sec. 8, of the Constitution, relating to marriages be-
tween the races, has no application. .

2. Constitutional Law—Power of this Court to Declare Legislative
Acts Unconstitutional.

The courts may declare an act of the Legislature unconstitu-
tional, but the power should be exercised sparingly and only in
those cases where the conflict between the act and the Constitu-
tion is very clear and beyond any reasonable doubt, and the two
cannot be reconciled.

CLARK, C. J., concurs in result.

APPEAL by defendant from *Bond, J.,* at February Term, 1914,
of WILSON.

This action was brought by the plaintiff for a mandamus to
compel defendant to admit to the proper public school of said
county for the white race his four children, who are of school
age. He alleged that his oldest child, Arthur Johnson, attended
school for two days, when he was refused further admission to
and attendance, as a pupil, at the school. He thereupon made
a demand upon the defendant for the admission of all his chil-
dren to the proper public school of the county for the white race,
and that defendant refused to comply with the said demand.
He further alleged that he was lawfully married and the chil-
dren, in whose behalf he made the demand upon the defendant,
are the lawful issue of the union.

JOHNSON *v.* BOARD OF EDUCATION.

The essential allegations of the complaint were virtually admitted in the answer, except the ninth, in which it is alleged that the plaintiff's children are entitled to admission to the schools for the white race, which is denied, and it is averred in the answer that said children are not entitled to attend the public schools for the white race, for the reason that they have negro blood in their veins. The presiding judge at the hearing of the application for the writ of mandamus entered the following judgment:

"This cause coming on to be heard, all parties being regularly before the court, both sides being represented by counsel, and in addition to the facts admitted in the answer, the following specific fact is admitted, towit: That each of said four minor children have a slight mixture of negro blood, the same being less in each child than one-sixteenth; and this hearing being had on 10 February, to which time it had been continued by consent:

"It is, therefore, on the admissions in the answer, coupled with the admissions above referred to, ordered, adjudged, and decreed as follows: That each of said children is entitled to attend the school for white children designated in the complaint, or any other school for white children in any other district in which said children or either of them may hereafter live; and the defendant board is hereby ordered and directed to allow all of said children all privileges with reference to said school which belong and appertain in any way to the white children of said school district.

"It is further adjudged that the plaintiffs recover of the defendant the costs of this proceeding, to be taxed by the clerk of the Superior Court of Wilson County.

"The court bases its judgment upon the following facts:

"First. It is admitted in the answer that the father of the said children was the husband by a valid marriage of the mother of said children.

"The Constitution provides that the Legislature shall provide separate schools for the children of the white and colored races, and it also makes valid a marriage between a white man and a woman who has not as much as one-eighth admixture of colored blood. (See·section 2, Article IX, and section 8 of Article XIV.)

"The court is of opinion that the Legislature exceeded its power when in section 4086 of Pell's Revisal it attempts to deny the offspring of· a marriage which the Constitution says is valid the right which generally pertains to children of that particular race. In other words, the status of the child is fixed by the constitutional recognition of the marriage."

Defendant excepted to the judgment, and has brought the case here by appeal.

*W. A. Finch and H. G. Connor, Jr., for plaintiff.*
*Barnes & Dickinson for defendant.*

WALKER, J., after stating the facts: We are strongly of the opinion that the learned judge erred in rendering judgment for the plaintiff. The facts, as stated by him in the judgment, plainly imply that the children inherited the negro blood from their mother, and it is admitted in the pleadings that the father, J. S. Johnson, is a white man, having a pure strain of blood. But the wife has less than one-eighth admixture of negro blood. So the question is presented, whether it was within the constitutional power of the Legislature to enact section 22, chapter 435 of the Public Laws of 1903, now Revisal, sec. 4086. In order to acquire an accurate conception of the question involved, it will be well to reproduce here the clauses of the Constitution and statute bearing upon it.

The Constitution provides as follows:

Art. IX, sec. 2: "The General Assembly, at its first session under this Constitution, shall provide, by taxation and otherwise, for a general and uniform system of public schools, wherein tuition shall be free of charge to all the children of the State between the ages of 6 and 21 years. And the children of the white race and the children of the colored race shall be taught in separate public schools; but there shall be no discrimination in favor of, or to the prejudice of, either race."

Art. XIV, sec. 8: "All marriages between a white person and a negro, or between a·white person and a person of negro descent to the third generation inclusive, are hereby forever prohibited."

Revisal, sec. 4086: "The children of the white race and the children of the colored race shall be taught in separate public schools; but there shall be no discrimination in favor or to the prejudice of either race. All white children shall be taught in the public schools provided for the white race, and all colored children shall be taught in the public schools provided for the colored race; but no child with negro blood in his veins, however remote the strain, shall attend a school for the white race; and no such child shall be considered a white child. The descendants of the Croatan Indians, now living in Robeson and Richmond counties, shall have separate schools for their children, as hereinafter provided in this chapter."

Should it be conceded, for the sake of discussion, that the marriage between J. S. Johnson and the woman who is the mother of his children is a valid one, it does not by any means settle the important and delicate question presented in this record in favor of the plaintiff. If Article XIV, sec. 8, *prohibiting* marriage "between a white person and a negro, or between a white person and a person of negro descent to the third generation inclusive" has the effect, contended for by learned counsel of plaintiff, to validate the marriage between plaintiff and the mother of his children, it does only that much and legitimates the offspring of the union; but by no subtle alchemy known to the laboratory of logic can it be claimed to have extracted the negro element from the blood in the veins of such offspring and made it pure. The clause merely prohibited marriage between persons one of whom is descended from a negro to and including the third generation. It does not even declare that marriages between persons one of whom has negro blood, though beyond the inhibited degree, shall be valid, but only that a marriage between a white person and one within the proscribed degree shall be void. But it is not necessary to the decision of this case that we should give an exact interpretation of that section of the Constitution and thereby fix its precise limits. If it validates the marriage and legitimates the progeny, it does not go far enough to deny to the Legislature the power of classifying school children, so as to exclude from the public schools

of the white race any and every child who had·inherited negro blood, "however remote the strain," or of declaring by enactment that no such child shall be considered as a member of the white race. It might, and perhaps would, lead to grave consequences if we should hold that, by section 8 of Article XIV, the Legislature has been deprived of any such power.

While we may pronounce an act of the Legislature unconstitutional, as we have often decided, the right to do so should be exercised sparingly, and the conflict between the fundamental law and the legislation should be manifest, and clear beyond any reasonable doubt. We should endeavor, by the use of all reasonable logic, to harmonize the two, and only resort to the power as a last expedient, where our plain duty requires us to exercise it in order to preserve the supremacy of the Constitution.

This case does not require us to invoke the power, as we are asked to do by the plaintiff, upon the ground, as he contends, that section 4086 of the Revisal is an unauthorized act of the Legislature and in direct violation of the Constitution.

Article XIV, sec. 8, leaves intact the right of the Legislature to provide, in the valid exercise of its police power and within its unquestionable privilege to declare the public policy of the State, that children of pure white blood and those having any negro blood, no matter how small a quantity, in their veins shall be separated in the public schools. Nor would it be proper for us to question the propriety or expediency of such a law, or to suggest whether it is wise or unwise. In this respect, the Legislature is a law unto itself, and its power to act, while, perhaps, not absolutely unlimited, can rarely ever be disputed.

Under the Constitution, the Legislature may also declare, as it has done in Revisal, sec. 4086, who shall be considered a white child, where there is an admixture of negro blood. Constitution, Art. IX, sec. 2, provides that "the children of the white race and those of the colored race shall be taught in separate public schools, but there shall be no discrimination in favor of, or to the prejudice of, either race." The first part of this clause taken from the Constitution favors the legislation contained in Revisal, sec. 4086, and the last part refers entirely to discrimina-

tion or prejudice in respect to school privileges and accommodations, and not to racial divisions or separation. If we give it any such construction, it would conflict with the policy declared in the first part of the clause. There is nothing else in the Constitution that touches the question, and we conclude, from what has been stated, that the Legislature was left free to pass section 4086 of the Revisal. If we were required to express an opinion, we would not hesitate to say that this construction clearly makes for the peace, harmony, and welfare of the two races, according to each race equal privileges and advantages of education and mental and moral training with the other, but keeping them apart in the schoolroom, where, by reason of racial instincts and characteristics peculiar to each, unpleasant antagonism would arise, which would prove fatal to proper school regulation and discipline, and end, of course, in disruption of our school system—a deplorable result for either race.

But the question has been considered by this Court, in one of its phases, in *Ferrall v. Ferrall,* 153 N. C., 177. *Justice Hoke* there said: "It may be well to note that since the decision of *Hare v. Board of Education,* 113 N. C., 10, the legislation as to separate schools for the two races has been changed, and it is now provided, 'that all white children shall be taught in the public schools provided for the white race, and all colored children shall be taught in schools provided for the colored race, but no child with negro blood in its veins, however remote the strain, shall attend a school for the white race.' Public Laws 1903, ch. 435, sec. 22 ; Revisal 1905, sec. 4086. The language of our Constitution on this subject, Art. IX, sec. 2, is: 'And the children of the white race and the children of the colored race shall be taught in separate public schools, but there shall be no discrimination in favor of, or to the prejudice of, either race.' It will be observed here that, unlike the section controlling the question of marriage, the words used are of more general import and permit of legislative definition in fixing the status of the two races, as in the case of *Wall v. Oyster* (decided by the Supreme Court of the District of Columbia, 7 June, 1910)."

This language of the Court is a plain recognition of the valid-

ity of Revisal, sec. 4086, to which it refers. The context of the opinion in that case also sustains our view, but we have selected for quotation that part which directly bears upon the question and places the matter beyond cavil or dispute.

The case of *Wall v. Oyster* is also in point, as will appear by this language of the Court: "Although providing for separate white and 'colored' schools, Congress has by no enactment undertaken to define what race or what percentage or proportion of racial blood shall characterize an individual as 'colored'; therefore, the term being without legislative definition, is left to the import ascribed to it in the common parlance of the people. There is, then, to be examined whether in the weekday speech of the people the word 'colored' bears a significance which should be considered to include this child. That the common use of the word throughout the United States is in no wise significant of mere complexion is quite definitely established by considering the universal habit of the people in their unalterable failure to apply it to the Indian, who is red, the Mongolian, who is yellow, or to the Malay, who is brown; its application to one of these un-fair complexions is not any time to be heard; to those of negro blood alone is it ever found to be suited; and then not depending for the propriety of its application upon a shade of particular blackness, but rather upon an admixture of a particular racial blood, the Negro. Whether complexions appear distinctly black or approaching toward the fair by gradations of shading is all one, if there be physical touches, whether of shade, hair, or physiognomy, telling of negro blood, such a one is held by the people to be 'colored,' despite his color or want of color. In confirmation of the accuracy of this conception, one need appeal to no mentor beyond the honesty of his own observations day by day. . . . Actual color seems to the public mind to be important only as one of the several evidences which, if sufficiently pronounced, serve to identify the subject as of the negro race; and this consideration, that is to say, the consideration of racial status, seems to my mind to measure an ultimate conception to which the mind of the people has arrived. It is this—putting away for the moment particular instances

which might present more refined complications: persons, of whatever complexion, who bear negro blood in whatever degree and who abide in the racial status of the Negro, are 'colored' in the common estimation of the people."

It will be observed that the Court, in that case, directed attention to the failure of Congress to define the word "colored," conceding its power to do so; while here we have a clear and accurate definition by the Legislature, which agrees with the public estimate of who is "colored," and definitely fixes the racial status of those who may be admitted to the white public schools and those who are disqualified by blood for such admission.

The case of *Tucker v. Blease,* 81 S. E., 668, decided by the Supreme Court of South Carolina in April of this year, is also closely applicable, as its facts are practically the same as those in this record. It was held there that the Legislature could separate the races in the public schools, notwithstanding a provision of the Constitution of that State substantially the same as Article XIV, sec. 8, of our Constitution. The Court also quotes, with evident approval and in support of its decision, a passage from *Plessy v. Ferguson,* 163 U. S., 537, as follows: "The distinction between laws interfering with the political equality of the negro and those requiring the separation of the two races in schools, theaters, and railway carriages has been frequently drawn by this Court. A statute which implies merely a legal distinction between the white and colored races, and which must always exist so long as white men are distinguished from the other race by color, has no tendency to destroy the legal equality of the two races. The object of the fourteenth amendment was undoubtedly to enforce the absolute equality of the two races before the law; but, in the nature of things, it could not have been intended to abolish distinctions based upon color, or to enforce social as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the

JOHNSON *v.* BOARD OF EDUCATION.

competency of the State legislatures, in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for the white and colored children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced."

Even considering alone the welfare of the two races, and following the maxim, "The greatest good to the greatest number," as said by the Court in *Plessy's case,* it would seem to be far better that the children of the two races should each be segregated than that a large majority of those attending the public schools should be denied educational advantages. It avoids the disastrous results of racial antagonisms, which cannot be removed by legislation, and does not withdraw from either race any of the equal benefits of education conferred by the Constitution and guaranteed by the laws of the land. This policy of racial separation in the schools is not only fixed by law in plain terms, but is commended by every consideration upon which the prosperity and happiness of the two races is founded. Living side by side in a free country, with equal rights before the law, it is a just and wise policy that provides for the maintenance of that harmony between the two races which is so essential to their friendly relations and to the peace and welfare of both.

The learned judge erred in deciding with the plaintiff, and we must, therefore, reverse the judgment, and direct that a judgment in accordance with this opinion be entered for the defendant in the court below:

Reversed.

CLARK, C. J., concurs in result.