145 So. 575

### STATE ex rel. FARMER v. BOARD OF SCHOOL COM'RS OF MOBILE COUNTY et al.
### I Div. 729.

Supreme Court of Alabama.
Jan. 19, 1933.

B. F. McMillan, Jr., and Smith & Johnston, all of Mobile, for appellant.

Pillans, Cowley & Gresham, of Mobile, for appellees.

ucation shall provide schools of two kinds, those for white children and those for colored children. The schools for white children shall be free to all white children over six years of age. The schools for colored children shall be free to all colored children over six years of age." School Code 1927, § 124.

The fixed policy of preserving race autonomy in our state is indicated by kindred constitutional and statutory provisions.

In Thurman v. State, 18 Ala. 276, decided in 1850, a "mulatto" was defined to be one of half white and half negro blood.

The Code of 1852, § 2, subsec. 4, changed this rule, saying: "The term 'negro,' within the meaning of this code, includes mulatto. The term 'mulatto,' or 'person of color,' within the meaning of this code, is a person of mixed blood, descended, on the part of the father or mother, from negro ancestors, to the third generation inclusive, though one ancestor of each generation may have been a white person."

This definition was brought forward into the successive Codes to the Code of 1896. Meantime the penal statute against intermarriage of the races followed the same definition. Code 1896, § 5096 (4018) (4189) (3602) (61). By the Code of 1907, § 2, subsec. 5, the definition of "negro," "mulatto," or "person of color," was extended to descendants of a negro to the fifth generation of either the paternal or maternal line, though one ancestor of each generation be a white person.

The miscegenation statute remained unchanged in the Code of 1907, § 7421.

The Code of 1923, § 2, subsec. 5, followed the definition of the Code of 1907—fifth generation.

The miscegenation statute remained unchanged—third generation. Code 1923, § 5001.

Meantime, however, a new provision had been incorporated into our Constitution, saying: "The legislature shall never pass any law to authorize or legalize any marriage between any white person and a negro, or descendant of a negro." Code 1928, section 102 of the Constitution.

Finally the Legislature of 1927 amended Code § 2, subsec. 5, so as to read: "The term 'negro,' within the meaning of this code, includes mulatto. The term 'mulatto,' or 'person of color,' within the meaning of this Code, is a person of mixed blood, descended on the part of the father or mother from negro ancesters, without reference to or limit of time or number of generations removed." Gen. Acts 1927, pp. 716, 717, § 2, subsec. 5.

The miscegenation statute was amended to prohibit intermarriage between any white person and a negro, "or the descendant of any negro." Gen. Acts 1927, p. 219.

## BOULDIN, J.

By this mandamus proceeding instituted in the circuit court of Mobile county, the relator sought to require the board of school commissioners of Mobile county to admit relator's children of school age to the public school for white children in their school district. They had been denied admittance on the ground that they were "colored children." From a judgment denying the petition, this appeal is prosecuted.

Without question these children have a clear legal right to attend the public school for the race to which they belong.

"Separate schools shall be provided for *white* and *colored* children, and no child of either race shall be permitted to attend a school of the other race." Section 256, Constitution 1901. (Italics supplied.)

Complying with this mandate, the Legislature has enacted: "The County Board of Ed-

This course of constitutional and statutory development denotes an increased strictness on the matters with which they deal.

■ Without elaborating upon this public policy as applied to the association of children in their school life, we conclude the provisions for separate schools for "colored children" contemplates that no child with an appreciable admixture of negro blood shall be admitted to a public school for white children. This is the construction usually given to similar provisions in other states. Mullins et al. v. Belcher, 142 Ky. 673, 134 S. W. 1151, Ann. Cas. 1912D, 456, and note 457, et seq.; Van Camp v. Board of Education, etc., 9 Ohio St. 406; Johnson v. Board of Education, 166 N. C. 468, 82 S. E. 832, L. R. A. 1915A, 828; Lee v. New Orleans Great Northern R. Co., 125 La. 236, 51 So. 182; State v. Treadaway, 126 La. 300, 52 So. 500, 139 Am. St. Rep. 514, 20 Ann. Cas. 1297; Wall v. Oyster, 36 App. D. C. 50, 31 L. R. A. (N. S.) 180.

■ Counsel for appellant strongly urge a reversal of the finding of the trial court upon the evidence. We have considered the evidence with care. The relator and his witnesses testify these are white children; have no negro blood. It appears the good people of the community are divided on the question. This is given emphasis by the evidence which seems to be undisputed, showing relator's children, a little girl of twelve, and a boy of eight years of age, were admitted to the school for white children, and attended same a number of years. A protest from other patrons led to an investigation resulting in refusing them further admittance to the white school.

It seems from the weight of the evidence this family is of a group known locally in Toulminville as "creoles." Admittedly this name is in general applied to white people of French or Spanish descent. Webster's Inter. Dict. "Creole." But respondents' testimony tends to show that locally it is applied to a mixed race in which negro blood is present.

Considerable evidence is devoted to their social connections and associations in all those relations where race lines are recognized among our people.

Here there is and has been, it seems, a division; some recognizing them as white people, others not.

Evidence tends to show that in much these creoles, so-called, form a social group of their own. There is no evidence, we believe, that relator and his family have ever classed themselves as negroes, or socially so identified themselves.

On this issue, it was proper on cross-examination to ask relator if he had any social relations with several white neighbors, nam-

ing them. This tended to shed some light on the issue, taken in connection with relator's direct testimony touching his social relations.

The trial judge saw and heard the witnesses; had the children before him. Evidence of negro blood through their maternal ancestors was more direct and persuasive.

■■ The case presents a regrettable situation. Without prolonged discussion, we find no sufficient reason to reverse the finding of the trial court. The burden was on relator to affirmatively show his children are entitled to attend the school for white children as the law defines white children. All due presumptions are to be indulged in favor of the finding of the court below.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.